UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAHINTAJ BAKHTIAR, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, et al.,<br><br>Defendants. | Civil Action 02-00092  (HHK) |

MEMORANDUM

This action is brought pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7),[1] by Shahintaj Bakhtiar ("Shahintaj"), who is the widow of Chapour Bakhtiar ("Chapour"), individually and as a representative of Chapour's estate, Chapour's son Goudard Bakhtiar ("Goudard"), and Chapour's stepdaughter Manijeh Assad Bakhtiar ("Manijeh") against the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS"), which is Iran's intelligence agency. Chapour is the former Prime Minister of Iran, and this action arises out of his August 6, 1991, assassination. This court entered default against defendants on April 3, 2007, and held a damages trial on November 27, 2007. At the trial, the court took judicial notice of the findings

---

[1] Plaintiffs brought suit under 28 U.S.C. § 1605(a)(7). Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008) ("National Defense Act"), 28 U.S.C. § 1605(a)(7) was replaced by 28 U.S.C. § 1605A. Section 1605(a)(7) still applies to actions brought prior to the effective date of 28 U.S.C. § 1605A, however. *Simon v. Repub. of Iraq*, __ F.3d __, 2008 WL 2497417, *4 (D.C. Cir. June 24, 2008) ("the new terrorism exception in § 1605A by its terms does not provide a substitute basis for jurisdiction over all cases pending under § 1605(a)(7) . . . to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision."). Accordingly, this court analyzes plaintiffs' action under 28 U.S.C. § 1605(a)(7).

of fact and conclusions of law in *Rafii v. Islamic Republic of Iran and Ministry of Information and Security*, 01-cv-850 (D.D.C. Dec. 2, 2002) ("*Rafii* Findings").[2]  Based upon the *Rafii* findings of fact and conclusions of law and the evidence presented at the damages trial, the court makes the following:

## I. FINDINGS OF FACT

**A.     Iran's Policy of Assassinating Dissidents**

1.      In 1979, Ayatollah Khomeni became the leader of Iran after leading an insurrection against the Shah of Iran.  *Rafii* Findings 1.[3]  Under Ayatollah Khomeini's rule, Iran adopted a policy of assassinating dissidents at home and abroad.  Iran has been linked to the assassination of leaders from the following Iranian dissident groups:  the Kurdish Democratic Party of Iran, the National Council of Resistance, the Mujaheddin, the National Movement for the Iranian Resistance ("NAMIR"), and the Flag of Freedom.  These assassinations have inhibited the activities of these Iranian resistance groups, as well as the activities of other groups.  *Id.* at 15-17.

2.      Iran's involvement in the assassination of political dissidents waned in the later years of Ayatollah Khomeini's regime.  Beginning in 1989, however, with the end of the Iran-Iraq war and the appointment of Ali-Akbar Hashemi Rafsanjani as President of Iran, there was

---

[2] In *Rafii,* Chapour's daughter, France Mokhateb Rafii was awarded damages against the Islamic Republic of Iran and the Iranian Ministry of Information and Security, arising out of the assassination of Chapour.

[3] Many of the cites to the *Rafii* Findings are verbatim excerpts.  For ease of reference, the court has not used quotation marks to indicate the verbatim excerpts.  Where the court quotes the *Rafii* Findings verbatim, the court has omitted reference to the internal cites, such as the cites to various exhibits.

2

a rash of assassinations of dissidents abroad, as well as a general period of increased Iranian-sponsored terrorism in general. Dissidents were murdered in Austria, Switzerland, France, German, Iraq, Turkey, and the United States. *Id.* at 16.

3. Iran has admitted that MOIS has engaged in the killing of dissidents. Indeed, Ayatollah Fallahian, who was in charge of MOIS at the time of Chapour's murder, made public comments taking responsibility for the killing of members of foreign-based groups that oppose the Iranian regime. *Id.* at 3-4.

4. Since 1984, the United States State Department has designated Iran a state sponsor of terrorism. *Id.* at 2.

**B.     Chapour Bakhtiar**

5. Chapour earned a Ph.D. in law and philosophy. During World War II, he fought with the French resistance, worked in the labor movement in Iran, and advocated for democracy. He could easily have joined the government of the Shah and ascended to the highest offices. *Id.* at 10. Instead, Chapour served in opposition to the regime, often spending time in jail as a result of his political activities. *Id.* In January of 1979, shortly before Ayatollah Khomeini's insurrection, Chapour was appointed Prime Minister of Iran, and he served in that capacity for thirty-seven days. *Id.* at 11.

6. After the fall of the government, Chapour remained popular. This worried Iran's new government and put his life in danger. On May 14, 1979, Ayatollah Kalkhali, a religious judge and chairman of Iran's Revolutionary Court announced in an interview in the Iranian paper *Kayan*, his intention to eliminate "the corrupters on earth," and specifically named Chapour as someone who had incurred the death penalty. *Id.* at 12. The phrase

"corrupter on earth" indicates that a *fatwa*, or a religious judgment, had been issued for Chapour's death. This *fatwa* instructed Muslims anywhere in the world that they could kill Chapour. Ayatollah Kahlkahli reiterated the *fatwa* on Chapour's life on December 7, 1979. *Id.*

7. After hiding in Iran, Chapour fled to Paris where he founded NAMIR with Dr. Abdul Rahman Boroumand. NAMIR was a major Iranian dissident group based outside of Iran. *Id.* at 13.

8. In 1980, there was a failed attempt to kill Chapour in Paris. A gunman killed a policeman and neighbor in the attack, but failed to kill Chapour. An individual named Anish Naccache was found guilty of the attack, and the French court found that Naccache was acting pursuant to the order of Ayatollah Khomeini to assassinate Chapour. *Id.* at 14.

9. After the attempted assassination in 1980, Chapour lived under heavy security. A police truck with policemen was stationed outside his home, and the basement of his house was turned into guard quarters where four special police from the French riot squad lived. Bakhtiar restricted his excursions outside his home, and when he did leave his house he was transported in armored cars. His son, Guy Bakhtiar, was a French policeman and was in charge of security for Chapour. Before anyone, including his own family, could visit Chapour, they had to submit to a search and present a passport that was kept by the police until the visitor left. *Id.* at 18.

10. On August 6, 1991, Guy Bakhtiar left Paris on a two-day trip. At approximately 5:00 p.m., Chapour received an expected visit from Farydoun Boyerahmadi, a member of NAMIR and a close associate. Boyerahmadi was accompanied by Mohammad Azadi and Ali Vakili Rad. Chapour had never met Azadi or Rad. *Id.* at 19.

11.   Boyerahmadi was an Iranian agent who successfully infiltrated NAMIR. He and the two other men murdered Chapour and his assistant, Foroush Katibeh, using two kitchen knives and took efforts to mutilate Chapour's body. *Id.*

12.   Chapour's murder was not discovered until Guy Bakhtiar returned from his trip on August 8, 1991. *Id.*

**C.   Iran's Role in the Assassination**

13.   A French Judge, Magistrate Judge Jean-Louis Brugueire, investigated Chapour's murder.[4] He concluded that Boyerahmadi, Rad, and Azadi perpetrated the murder and that Iran was responsible for the assassination. *Id.* at 22.

14.   Judge Brugueire described Iran's involvement in the murder plot as follows: On May 29, 1991, in Teheran, two passports were delivered to Vakili Rad and Azadi under the assumed names of Kamal Hosseini and Norian. The Iranian public authorities in charge of passport delivery were either disorganized, or were acting in coordination with two of Chapour's murders. Judge Brugueire found the second alternative was the more likely

---

[4] The French judicial system is different from that of the United States. In France, magistrate judges are charged with investigating crimes. In cases involving terrorism, the magistrate judge finds and examines witnesses and then gives an "interrogatory commission" to the police to discover who was responsible for the death. At the end of the investigation, the magistrate issues a judicial determination of the guilt or innocence of the accused, and sends the investigation file to the state attorney who prepares a report, called a *requistoire*, ordering the magistrate to send the file to a special section of the Court of Appeal, which at the time of the Chapour case was called the *Chambre D'Accusation*, and is comprised of a three-judge panel. If the three-judge panel agrees with the findings, the report is sent to the *Court of Assizesi,* which determines whether the "accusation" is to be dismissed or upheld and pronounces the sentence. Attorneys representing the victim or the victim's family have access to the investigation file and the opportunity to intervene in the case after the magistrate has made his investigation. If the attorneys are not satisfied with the conclusions reached in the investigation, they may appeal the decision to the Court of Appeal. Judge Brugueire, who investigated Chapour's murder, is the judge who handles terrorism cases in France, and he specializes in Iranian terrorism cases. *Rafii* Findings 20.

option considering that in June and July 1991 some of the representatives of the Iranian High-Ranking Civil Service – businessmen and members of the Iranian Consular Staff – were connected to the assassination.  *Id.*  In mid-June 1991, Hossein Sheik Attar, a member of the Iranian Telecommunication Civil Service, arranged via Seyed Hendi,[5] to obtain business invitations for Rad and Azadi from the French company Syfax – a necessary requirement for the approval of their visas.  At the same time, Shoorideh Shirazi, an Iranian businessman and "VIP,"[6] arranged for the entry of Nasser Ghasmi Nejad into Switzerland in order to facilitate the escape of the assassins.  *Id.*  On July 16, 1991, the State Department of the Islamic Republic of Iran delivered an assignment order to Zeynolabedine Sarhadi so that he would reach Switzerland between July 21 and October 21, 1991.  Sarhadi was an employee from the Iranian Department of State, and he personally helped and assisted Ghasmi Nejad and Azadi.  Judge Brugueire also concluded that "the conspiracy kept functioning within [the Iranian Department of Telecommunications] during the period corresponding to that of the murderers' escape." *Id.*  The "conspiracy of criminal purpose was organized according to a three-pole pattern: Department of Telecommunications -[Islamic Republic of Iran Broadcasting]-State Department."  *Id.*  Judge Brugueire also found that the murderers received material support in Turkey prior to entering France to assassinate Chapour, and that Iranian

---

[5] According to Judge Brugueire, Hendi was, if not a member of the Islamic Republic of Iran Broadcasting, someone who had close connections to this Department.  Judge Brugueire's investigation found the private phone number of the Iranian Vice-Secretary of Security and the head of Iran's Department of Islamic Orientation in Hendi's electronic organizer.  *Rafii* Findings 22 n.5.

[6] Shoorideh had acquaintances within the High-Ranking Civil Service of the state of Iran and was in contact with Iranian leaders.

        intelligence officials were involved in this aspect of the conspiracy. *Id.* This fact led Judge Brugueire to conclude that "the Iranian Intelligence contributed to the functioning of the criminal conspiracy indeed." *Id.*

15. The *Chambre D' Accusation* agreed with Judge Brugueire that Iran and its intelligence service were behind the murder. *Id.* at 23. In 1995, the *Court of Assizes* then convicted three defendants of the murder. *Id.* During the trial in the *Court of Assizes*, the attorney for the Bakhtiar family testified that he spoke to an unnamed Iranian official named "Witness C." Witness C was an Iranian official who had defected, and who had testified in a German case concerning a 1992 Iranian-sponsored assassination. The attorney testified that Witness C told him that MOIS organized Chapour's assassination. *Id.* at 24.

16. In addition, both the *Bundeskriminalamt*, which is the German equivalent of the Federal Bureau of Investigation, and the United States Department of State determined that Iran was responsible for Chapour's assassination. *Id.* at 25.

**D.**    **Plaintiffs and Their Relationship With Chapour**

17. Shahintaj, a resident of California, is the surviving spouse of Chapour. She brings suit on her own behalf and as representative of the Estate of Chapour Bakhtiar. Shahintaj is the mother of Chapour's son, Goudard. Shahintaj is also the mother of Chapour's stepdaughter, Manijeh.

18. Chapour never adopted Manijeh. Chapour wished to adopt Manijeh and investigated the possibility of doing so, but was informed by an attorney that he could not adopt Manijeh because Manijeh was more than sixteen years old. Chapour did, however, provide some financial assistance to Manijeh, such as paying for her schooling.

19. Shahintaj, Goudard, and Manijeh were citizens of the United States at the time of Bakhtiar's assassination, and they are still citizens of the United States.

20. Chapour's death upset Shahintaj. She testified that she considered Chapour to be her soul mate, that she has worn black ever since Chapour died, and that she does not intend to marry again or have another relationship. Goudard testified that he has no memory of Chapour's death, but that he recalls being five or six and crying for Chapour. He also testified that he misses having a father figure in his life. Manijeh testified that she was greatly upset by Bakhtiar's death, and that as a result of his death she was suicidal.

## II. CONCLUSIONS OF LAW

21. As a general rule, the Foreign Sovereign Immunities Act ("FSIA"), enacted in 1976, establishes that foreign states are immune from suit in courts in the United States. 28 U.S.C. § 1604.[7] There are a limited number of exceptions to this general rule of immunity, including the state-sponsored terrorism exception. 28 U.S.C. § 1605(a)(7).

**A.   Applicability of the State-Sponsored Terrorism Exception**

22. The state-sponsored terrorism exception provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" when money damages are sought, if several criteria are met. 28 U.S.C. § 1605(a)(7). As set forth in 28 U.S.C. § 1605(a)(7), the criteria are as follows:

---

[7] 28 U.S.C. § 1604 states:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

    (A)    The personal injury or death at issue resulted from an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources;

    (B)    The act at issue was perpetrated by a foreign state or by an agent of that state;

    (C)    The foreign state was designated as a state sponsor of terrorism at the time of the terrorist act or was later so designated as a result of such act;

    (E)    Either the plaintiffs or victims were United States nationals at the time of the incident.[8]

23. Plaintiffs must establish their "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

24. The state-sponsored terrorism exception applies to the instant action. The FSIA adopts the definition of "extrajudicial killing" used in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1605(e)(7). The TVPA defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350 note. Chapour's murder meets this definition. The murder was deliberate and meticulously planned. Chapour was not "afforded the judicial

---

[8] Section 1605(a)(7) also provides that if the act occurred within the foreign state defendant's territory, the foreign state must be offered a reasonable opportunity to arbitrate the matter. Because the murder occurred in France and not Iran, this provision is not applicable.

process contemplated by the statute." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 107 (D.D.C. 2000).  Furthermore, "assassination is clearly contrary to the precepts of humanity as recognized in both national and international law." *Id.* (internal quotation omitted).

25. The facts set forth above establish that Chapour was specifically targeted for death by officials and agents of the Iranian government.  As noted in the *Rafii* Findings, "judges have found Iran liable in cases 'where its involvement . . . in terrorist acts was much less direct and involved only the provision of support and resources to terrorist groups.'" *Rafii* Findings 18 (*quoting Elahi*, 124 F. Supp. 2d at 108).  Because Iran was directly involved in Chapour's assassination, plaintiffs have satisfied their burden of demonstrating that a foreign state was responsible for Bakhtiar's assassination.

26. Iran has been designated as a state-sponsor of terrorism since 1984; thus, it was so designated at the time of Chapour's murder 1991 and at the time that plaintiffs filed the instant action.

27. Plaintiffs have established that they were nationals of the United States at the time of Chapour's death.  The term "national of the United States" includes United States citizens.  8 U.S.C. § 1101(a)(22).  Shahintaj, Goudard, and Manijeh were citizens of the United States at all relevant times.

**B.     Cause of Action**

28. Section 1605(a)(7), the state-sponsored terrorism exception of FSIA, is "merely a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d

1024, 1032 (D.C. Cir. 2004).[9] Accordingly, to determine what causes of action, if any, can be pressed against a non-immune foreign state, the FSIA directs courts to pre-existing causes of action, such as state common or statutory law. *Cicippio-Puleo*, 353 F.3d at 1036; *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 23 (D.D.C. 2005).

29. Plaintiffs only assert a cause of action under California law for intentional infliction of emotional distress.[10]

**C. Intentional Infliction of Emotional Distress Under California Law**

30. Under California law, a cause of action for intentional infliction of emotional distress ("IIED") lies where defendants engage in "outrageous conduct which is intentional or reckless and which is outside the bounds of decency." *Christensen v. Superior Ct.*, 820 P.2d 181, 203 (Cal. 1991). To recover for IIED, plaintiffs must demonstrate: (1) extreme and outrageous conduct by the defendant with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Davidson v. City of Westminister*, 649 P.2d 894, 901 (Cal. 1982).

---

[9] When Congress enacted § 1605A in January 2008, Congress specifically provided plaintiffs with a cause of action against a foreign state. Thus, § 1605A, unlike § 1605(a)(7), is not a "pass through" statutory provision. Plaintiffs have not attempted to amend their complaint to assert a cause of action under § 1605A, however.

[10] At the trial on damages, plaintiffs indicated that they were asserting numerous causes of action, including wrongful death. The court instructed plaintiffs to submit proposed findings of fact and conclusions of law, and to specifically delineate the causes of actions that they are asserting. In these proposed findings of fact and conclusions of law, plaintiffs state that they are alleging only a "cause of action under California law for intentional infliction of emotional distress." Supplemental Proposed Findings of Fact and Conclusions of Law 17 [#43].

*1. Extreme and Outrageous Conduct Directed at Plaintiffs*

31. There is no question that defendants' assassination of Chapour was an outrageous act. Nor is there any question that it was directed at Chapour. There is, however, a question as to whether, by assassinating Chapour, defendants intended to cause emotional distress to Chapour's family members, who are plaintiffs in this action.

32. Courts in this district have consistently held that a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families. *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (*citing Burnett v. Al Barka Inv. and Dev. Corp.*, 274 F. Supp. 2d 86, 107 (D.D.C. 2003); *Jenco v. Islamic Republic f Iran*, 154 F. Supp. 2d 27, 35 (D.D.C. 2001)). The court sees no reason why this logic should not apply under California law. *See Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 282 (D.D.C. 2007) (finding that, under California law, a terrorist attack is directed at victims' families for purposes of an IIED claim). Accordingly, the court concludes that, by assassinating Chapour, defendants intended to cause emotional distress to Shahintaj and Goudard, who are Chapour's wife and son.

33. The court cannot conclude, however, that defendants intended to cause emotional distress to Manijeh, who is Chapour's stepchild. "For practical reasons, even in terrorism cases, courts have stopped short of treating certain family members as direct victims." *Oveissi*, 498 F. Supp. 2d at 282 (finding grandson was not a direct victim); *see also Bettis v. Islamic Republic of Iran*, 315 F. 3d 325, 334-35 (D.C. Cir. 2003) (finding that nieces and nephews are not direct victims). Plaintiffs suggest – and this court agrees – that to determine whether Manijeh is considered to be a family member – and therefore a "direct

victim" – for purposes of an IIED claim, this court should look to the California Probate Code. *See Oveissi,* 498 F. Supp. 2d at 282-83 (looking to California Probate Code to determine whether grandchild has standing to bring claim for IIED); *Estate of Heiser*, 466 F. Supp. 2d 229, 309-10 (D.D.C. 2006) (finding that, based on California Probate Code, stepparent could not recover under claim for IIED).

34. The California Probate Code provides that a stepchild qualifies as a member of a family for purposes of intestate succession if the stepchild's relationship with her stepparent: (a) began during the person's minority and continued throughout the joint lifetimes of the person and the person's foster parent or stepparent, and (b) the stepparent would have adopted the person but for a legal barrier. Cal. Prob. Code § 6454.[11]

35. Chapour became Manijeh's stepfather while Manijeh was still a minor. Thus, the stepparent/stepchild relationship at issue here began during Manijeh's minority.

36. There was, however, no legal barrier to Manijeh's adoption. Plaintiffs assert that there was a legal barrier to Manijeh's adoption because Chapour wanted to adopt Manijeh and would have, but for having been informed by an attorney that Manijeh could not be adopted after she turned sixteen years of age. In other words, plaintiffs argue that receiving incorrect advice from a lawyer constitutes a legal barrier.

37. Bad legal advice does not qualify as a "legal barrier." A "legal barrier" exists when there is some basis in the law as to why an adoption cannot take place. For example, legal barriers consist of the failure of the biological parent, adopting person's spouse, or adoptee to consent; the "limitation of 'only one adult adoption of unrelated persons per

---

[11] This provision was previously codified at Cal. Prob. Code § 6408.

year,' and the requirement that an adult adoption [ ] must be '[in] the best interests of the [persons seeking the adoption] and in the public interest.'" *Estate of Joseph*, 949 P.2d 472, 479 (Cal. 1998) (*quoting Estate of Cleveland*, 22 Cal. Rptr. 2d 590, 596 n.10 (Cal. Ct. App. 1993) (alterations in original)). Furthermore, this legal barrier must have "continued throughout the joint lifetimes . . . [and not just] at a time at which adoption was contemplated or attempted." *Estate of Joseph*, 949 P.2d at 477. Because there was no legal impediment to adopting Manijeh, plaintiffs have failed to demonstrate that Manijeh is a family member pursuant to the California Probate Code.[12] Accordingly, while Shahintaj and Goudard may state a claim for IIED, Manijeh cannot recover for IIED.

   2. *Severe Emotional Distress*

38.   Under California law, plaintiffs "may not recover for [IIED] unless the distress suffered has been severe." *Hailey v. California Physicians' Service*, 69 Cal. Rptr. 3d 789, 808 (Cal. Ct. App. 2007). Severe emotional distress means "emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Fletcher v. W. Nat'l Life Ins. Co.*, 89 Cal. Rptr. 78, 90 (Cal. Ct. App. 1970) (relying on Restatement (Second) Torts § 46). The "requisite emotional distress may consist of any highly unpleasant mental reaction such as fright,

---

[12] There is case law indicating that under California law, to recover for the tort of negligent infliction of emotional distress, a plaintiff does not have to be an immediate family member. Instead, a plaintiff may recover if she demonstrates a sufficiently close relationship with the decedent. *See Kriventsov v. San Rafael Taxicabs, Inc.*, 229 Cal. Rptr. 768, 769 (Cal. Ct. App. 1986). The tort of negligent infliction of emotional distress is, however, "completely distinct" from the tort of intentional infliction of emotional distress. *Coon v. Joseph*, 237 Cal. Rptr. 873, 875 (Cal. Ct. App. 1987).

grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Id.* at 91. The court should consider the "duration of the emotional distress" when determining its severity. *Id.*

39. Shahintaj has demonstrated that she suffered severe emotional distress as a result of Chapour's murder. Shahintaj testified that she has worn black ever since her husband's death, and that she does not intend to marry or have another relationship. In other words, Shahintaj has suffered extensive grief over a prolonged period of time as a result of defendants' actions.[13]

40. Plaintiffs have not, however, demonstrated that Goudard or Chapour suffered emotional distress as a result of the murder. Goudard testified that his father died when he was young and that he has no memory of his father.[14] Accordingly, he did not suffer any emotional distress as a result of the murder. As for Chapour, plaintiffs offered no evidence at trial that he suffered emotional distress at the time of the assassination. Accordingly, the court is unable to find that Chapour suffered emotional distress.

### 3. Causal Connection

41. Lastly, plaintiffs must demonstrate that the murder of Chapour actually and proximately caused the emotional distress at issue. As a consequence of the analysis set forth above, Shahintaj is the only remaining plaintiff who can recover for IIED. There is no question

---

[13] There is substantial evidence Manijeh has also suffered severe emotional distress as a result of Chapour death. For example, she was suicidal. However, for the reasons discussed in the text *supra*, she cannot recover under a claim for IIED.

[14] Goudard testified that when he was about five or six he cried to his mom, asking after his father. He also testified that he has missed growing up without a father because there are "things only a man could teach another, another man." Trial Tr. 61: 1-2, November 27, 2007. These circumstances are insufficient to demonstrate emotional distress.

that the murder caused her emotional distress; the murder caused her to experience a deep sense of loss and grief.

### D. Compensatory Damages

42. "In determining the appropriate amount of compensatory damages, the [c]ourt may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." *Estate of Heiser*, 466 F. Supp. 2d at 269. "While the loss suffered . . . is undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse." *Id.*

43. The court concludes that, as a result of defendants' wrongful conduct, Shahintaj has suffered, and will continue to suffer, pain and mental anguish. Shahintaj testified that she and Bahktiar were soul mates, that she wears black every day and will never have another relationship. Accordingly, the court awards Shahintaj $12 million in compensatory damages for her pain and suffering.

### E. Punitive Damages

44. Pursuant to a Memorandum in Support of Supplemental Proposed Findings of Fact [#45], plaintiffs seek punitive damages. Plaintiffs did not initially seek punitive damages because, prior to the enactment of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008), punitive damages could not be recovered against a foreign state. Newly enacted 28 U.S.C. § 1605A(c) provides plaintiffs with a private right of action for "personal injury or death" against foreign states, and permits plaintiffs to recover punitive damages under this cause of action.

45.     Plaintiffs, however, have not moved to amend their complaint to assert a cause of action under § 1605A.  Because plaintiffs do not assert a cause of action against Iran under § 1605A(c), they cannot recover punitive damages.

### III.  CONCLUSION

For the foregoing reasons, Shahintaj Bakhtiar is entitled to $12 million in compensatory damages for IIED arising out of the assassination of Chapour Bakhtiar.  Goudard Bakhtiar, Manijeh Assad Bakhtiar, and the Estate of Chapour Bakhtiar are not entitled to any damages.  An appropriate order accompanies this memorandum.

Henry H. Kennedy, Jr.<br>United States District Judge